**LARA S. MEHRABAN**
**ACTING REGIONAL DIRECTOR**
**Thomas P. Smith, Jr.**
**Michael D. Paley**
**Judith A. Weinstock**
**Paul G. Gizzi**
**Kristine M. Zaleskas**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-0077 (Gizzi)**
**GizziP@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | **22 Civ. _____ (     )** |
| -against- | |
| **DOMENIC CALABRIGO, CURTIS ("CURT") LEHNER, HASAN SARIO, and COURTNEY VASSEUR,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Domenic Calabrigo ("Calabrigo"), Curtis (Curt) Lehner ("Lehner"), Hasan Sario

("Sario"), and Courtney Vasseur ("Vasseur") (collectively, the "Defendants") alleges as follows:

## SUMMARY

1.      From early 2016 through late 2018 (the "Relevant Period"), some or all of the

Defendants manipulated the stocks of at least nine microcap issuers.

2.      As set forth in more detail below, the Defendants' scheme for each stock followed

the same general formulation, which is often referred to as a "pump-and-dump" fraud.  The

Defendants and their associates obtained a controlling interest in the securities of a microcap issuers through a series of transfers and purchase agreements with nominee shareholders.  The Defendants then used a network of offshore entities and brokerage accounts ("Offshore Trading Platforms", discussed further below) to deposit the shares in mostly offshore brokerage firms, and in accounts that were not in their own names but rather were in the names of the Offshore Trading Platforms or nominee entities.

3.      Not only did the Defendants and their associates hide their control of the issuers through the accounts and the nominee entities they used, but they also sought to hide their control of these issuers by dividing up the shares in separate accounts such that none of the accounts held more than 5 percent of the issuer's outstanding float. By doing so, the Defendants deceived the public, brokers, and regulators by knowingly avoiding the disclosure obligations of Section 13(d) of the Securities Exchange Act of 1934, which would have informed investors of their control of the issuers.

4.      Once they had secretly obtained control of these issuers, the Defendants then engaged in fraudulent schemes to profitably sell their shares.

5.      The Defendants engaged in promotional activity such as sending emails and setting up websites touting the stocks.  The purpose of the promotional activity was to generate interest among investors to purchase shares, and thereby generate liquidity into which the Defendants profitably sold their shares.

6.      The Defendants paid stock promoters clandestinely through conduit entities. None of the promotional materials disclosed that the promotions were funded by people who controlled the relevant issuer nor that those individuals would be selling their stock during the "pump."

7.      In addition, in advance of the promotional activity, the Defendants often directed trading activity to increase trading volume.  Their purpose was to induce innocent investors to purchase the stock, based on the contrived appearance of active investor interest in the issuer.

8.      After the "pump," the Defendants "dumped" their stock.  These sales were in violation of the registration requirements of the federal securities laws, as the sales were not registered with the Commission, and were not exempt from registration.

9.      The Defendants' stock sales were treated by the market as if they were sales by ordinary investors, when, in actuality, the Defendants were dumping stock into the securities markets on behalf of an undisclosed control group in violation of the laws governing such sales.

10.     The Defendants then used the Offshore Trading Platforms, and other foreign entities and bank accounts under their control, to distribute the sale proceeds.

11.     As a result of these frauds, the Defendants and their associates yielded net proceeds of over $39 million.

## VIOLATIONS

12.     By virtue of the foregoing conduct and as alleged further herein, the Defendants Calabrigo, Lehner, Sario and Vasseur have violated Sections 5(a) and (c) and 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1) and (3)], Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].  In the alternative, the Defendants aided and abetted each other's violations of Securities Act Sections 17(a)(1) and (3) [15 U.S.C.§ 77a(a)(1) and (3)] and Exchange Act Sections 9(a)(2) and 10(b) [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) [17

C.F.R. § 240.10b-5(a) and (c)].

13.     Unless the Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

14.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)].

15.     The Commission seeks a final judgment: (a) permanently enjoining the Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering the Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7);; (c) ordering the Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting the Defendants from participating in any offering of a penny stock, pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Securities Act Section

22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

17.    The Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

18.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  For example, investors residing in the Southern District of New York purchased the stocks discussed in this Complaint while the Defendants were pumping and dumping them.

## DEFENDANTS

19.    **Calabrigo,** age 29, is a Canadian citizen and permanent resident of Nassau, Bahamas.

20.    **Lehner**, age 53, is a Canadian citizen who resides in British Columbia.

21.    **Sario**, age 48, resides in Turkey, and also has an address in Magliaso, Switzerland.

22.    **Vasseur**, age 41, is a Canadian citizen who resides in British Columbia.

## THE MANIPULATED STOCKS

23.    The pump-and-dump frauds perpetrated by the Defendants involved the stock of microcap issuers, *i.e.*, companies with relatively few assets and low stock prices, and sold on the over-the-counter market rather than being listed on an exchange.  Often these issuers are shell companies, i.e., a company with no or nominal operations or assets.  Specifically, the indicated Defendants manipulated the stocks of the following issuers (the "Relevant Issuers"):

- **Blake Therapeutics Inc. (ticker: BKIT)** was a Nevada corporation with its

principal place of business in New York, New York.  When the four Defendants were manipulating BKIT, BKIT purported to be in the business of providing insomnia remedies.  BKIT had a class of common stock registered under Section 12(g) of the Securities Exchange Act of 1934.  In its Form 10-K for the year ended August 31, 2016 BKIT reported assets of $4,783, and liabilities of $85,924.

- **Bingo Nation, Inc. (ticker: BLTO)** was a Nevada corporation with its principal place of business in Las Vegas, Nevada.  When Defendants Lehner, Vasseur, and Sario were manipulating BLTO, BLTO purported to offer televised bingo games and related kiosks at which customers could buy bingo cards for the weekly game broadcasts.  BLTO had a class of common stock registered under Section 12(g) of the Exchange Act.  In its Form 10-Q for the quarter ended September 30, 2016, BLTO reported $1,732 of current assets (and $275,363 of non-current assets), and liabilities of $689,470.  The Commission suspended trading in BLTO on April 13, 2017 for ten business days "because of concerns regarding the accuracy and adequacy of publicly available information in the marketplace and potentially manipulative transactions in Bingo Nation's common stock."[1]

- **Drone Guarder, Inc. (ticker: DRNG)** was a Nevada corporation with its principal place of business in San Francisco, California and later London, United Kingdom.  When the four Defendants were manipulating DRNG, DRNG purported to be an early stage security and surveillance company focusing on commercializing a drone enhanced home security system.  During the relevant period, DRNG had a class of common stock registered under Section 12(g) of the

---

[1]        In the Matter of Bingo Nation Inc. Order of Suspension of Trading, dated April 12, 2017
https://www.sec.gov/litigation/suspensions/2017/34-80445-o.pdf

Exchange Act.  In its Form 10-K for the year ended January 31, 2017, DRNG reported assets of $2,944, and liabilities of $105,763.

- **Horizon Minerals Corp. (ticker: HZNM)** was a Delaware corporation with its principal place of business of Las Vegas, Nevada.  When Defendants Lehner, Vasseur, and Sario were manipulating HZNM, HZNM purported to be in the business of acquiring and developing mineral properties.  In its Form 10-Q for the quarter ended September 30, 2016, HZNM reported $181 of current assets, and liabilities of $150,138.

- **I-Wellness Marketing Group Inc., (ticker: IWMG) formerly known as Monarchy Ventures Inc. (ticker: MONK)** was a Nevada corporation with its principal place of business in Las Vegas, Nevada.  When Defendants Lehner and Sario were manipulating IWMG, IWMG purported to be in the business of developing a health and fitness phone application.  IWMG had a class of common stock registered under Section 12(g) of the Securities Exchange Act of 1934.  In its Form 10-Q for the quarter ended September 30, 2015, IWMG reported $23,353 of current assets and $180,344 of total assets, and liabilities of $1,033,595.

- **Oroplata Resources Inc. (ticker: ORRP)** was a Nevada corporation with its principal place of business in the Dominican Republic and later, Henderson, Nevada.  When Defendants Lehner, Vasseur, and Sario were manipulating ORRP, ORRP purported to be a mineral exploration company.  During the relevant period, ORRP had a class of common stock registered under Section 12(g) of the Exchange Act.  In its Form 10-K for the year ended September 30, 2015, ORRP

reported assets of $10,946 and liabilities of $101,666.

- **Preston Corp. (ticker: PSNP)** was a Nevada corporation with its principal place of business in Austin, Texas.  When Defendants Lehner, Vasseur, and Sario were manipulating PSNP, PSNP purported to be in the business of royalty financing for mining operations.  During the relevant period, PSNP had a class of common stock registered under Section 12(g) of the Exchange Act.  In its Form 10-K for the year ended September 30, 2015, PSNP reported assets of $73,431, and liabilities of $124,900.  The Commission suspended trading in PSNP stock on September 3, 2016 for ten business days "because of questions regarding the adequacy and accuracy of available information about Preston Corp. in light of a false statement about the permitting status of a mine in the company's August 10, 2016 press release and questions regarding the adequacy and accuracy of clarifications Preston Corp. provided in a September 1, 2016 press release about the mining project."[2]

- **Vilacto Bio, Inc. (ticker: VIBI)** was a Nevada corporation with its principal place of business in Naestved, Denmark.  When Defendants Lehner, Vasseur, and Calabrigo were manipulating VIBI, VIBI purported to be in the business of marketing skin care products.  During the relevant period, VIBI had a class of common stock registered under Section 12(g) of the Exchange Act.  In its Form 10-Q for the quarter ended December 31, 2016, VIBI reported assets of $540, and liabilities of $35,808.

- **Zenosense, Inc. (ticker: ZENO)** was a Nevada corporation with its principal

---

[2]       In the Matter of Preston Royalty Corp. aka Preston Corp., Order of Suspension of Trading (Sept. 2, 2016). https://www.sec.gov/litigation/suspensions/2016/34-78757-o.pdf

place of business in Valencia, Spain.  When Defendants Lehner, Vasseur, and

Calabrigo were manipulating ZENO, ZENO purported to be a healthcare

technology company.  During the relevant period, ZENO had a class of common

stock registered under Section 12(g) of the Exchange Act.  In its Form 10-Q for

the quarter ended September 30, 2016, ZENO reported assets of $182,165 and

liabilities of $423,845.

## RELEVANT ENTITIES AND INDIVIDUALS

24.     **The Offshore Trading Platforms** are three networks that provided the

Defendants with the means of obscuring their identities and stock ownership, through foreign

nominee entities and offshore bank and brokerage accounts:

- **Bajic-Taneja Platform** was a network of entities and brokerage accounts
  located in Asia, operated by Steven Bajic and Rajesh Taneja.  In January
  2020, the Commission charged Bajic and Taneja with securities fraud in
  connection with their operation of this platform.  *See SEC v. Bajic et al.*,
  20-cv-00007 (S.D.N.Y.).

- **Blacklight S.A. ("Blacklight")** was a purported asset management firm
  based in Switzerland.  In January 2020, the Commission charged
  Blacklight and its control persons with securities fraud.  *See SEC v.
  Ciapala et al.*, 20-cv-00008 (S.D.N.Y.) and *SEC v. Bajic et al.*, 20-cv-
  00007 (S.D.N.Y.).

- **Wintercap SA, formerly known as Silverton SA ("Wintercap")** is a
  purported asset management firm based in Switzerland. In October 2018,
  the Commission charged Wintercap and its principal with securities fraud.

*See SEC v. Knox, et al.*, 18-cv-12058 (D. Mass.).

25.     **Antevorta Capital Partners, Ltd. ("Antevorta")** is an entity that is incorporated in both Canada and the British Virgin Islands.

26.     **Aaron Dale Wise ("Wise")** is a Florida resident.  Wise promoted microcap stocks.  The Commission charged Wise with securities fraud in January 2020.  *See SEC v. Bajic et al.*  20-cv-00007 (S.D.N.Y.).

27.     **Frederick L. Sharp ("Sharp")** is a Canadian resident who operated a network of offshore shell companies and encrypted accounting and communications systems for use by microcap fraudsters.  In August 2021, the Commission charged Sharp with securities fraud.  *See SEC. v. Sharp et al.*, 1:21-cv-11276 (D. Mass).

28.     **Christopher McKnight ("McKnight")** is a Canadian citizen who resides in Vancouver, British Columbia.  McKnight promoted microcap stocks.  The Commission charged McKnight with securities fraud in January 2020.  *See SEC v. Bajic et al.*, 20-cv-00007 (S.D.N.Y.).

## FACTS

### I.     Overview of the Defendants' Scheme

29.     The Defendants, together and individually, have been associated with microcap issuers for years.  They have frequently worked together on microcap deals, as a team, as well as with many other individuals and entities, several of which have since been charged by the Commission in connection with fraudulent microcap-related schemes.  The Defendants frequently used encrypted messaging and email applications with code names to communicate

with each other, associates, and the Offshore Trading Platforms concerning the schemes.

30.     The Defendants' schemes followed a similar pattern.  First, the Defendants gained control of the targeted microcap company's public float, i.e., the purportedly unrestricted stock that was available for trading.  Working with other individuals and entities such as Sharp and Antevorta, the Defendants obtained at least the majority of the shares in the issuer's public float, often more than 90 percent.

31.     By virtue of their control of the float of the issuers, as well as, in some cases, their relationships with management of the issuers, Defendants and their associates were affiliates of the issuers, as that term is defined in Commission Rule 144(a)(1) [17 C.F.R. §144(a)(1)].[3]

32.     The control of these issuers by Defendants and their associates was often accomplished through private stock purchases from nominee shareholders associated with Sharp, or by conversion of purported debt to shares.  The shares controlled by the Defendants and their associates were ultimately held in the names of entities which, by design, were virtually untraceable to the Defendants.  In some instances, the Defendants and their associates had relationships with the individuals managing the issuers, including direct lines of communications, and they sometimes made payments to these individuals through offshore bank accounts.

33.     For example, on November 14, 2016, HZNM received a wire for "reimbursement of corporate expenses" from an account of an entity associated with Vasseur and Lehner.  That same account also paid HZNM for expenses associated with OTC Markets.

---

[3]     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person). "Control" means the power to direct management and policies of the company in question. Typically, affiliates include officers, directors and controlling shareholders but any person who is under "common control" with or has common control of an issuer is also an affiliate.

34.     In addition, Lehner was sent a draft of IWMG's quarterly financial report on Form 10-Q on May 15, 2015, three days before the document was filed publicly with the Commission on May 18, 2015.  Furthermore, Vasseur created three email accounts for use by PSNP personnel and sent the email addresses and password to the PSNP CEO.

35.     Next, the Defendants worked with the Offshore Trading Platforms to deposit their shares at various broker-dealers, typically offshore, in accounts intended to conceal the true beneficial ownerships. These accounts were often in the name of one of the Offshore Trading Platforms, or in the name of one of many nominee entities managed by the Offshore Trading Platforms.  By Defendants' design, for the majority of these issuers, none of these entities held more than 5 percent of the issuer's publicly trading stock.

36.     By hiding their control of the majority of these issuers through the use of nominee entities such that none of which held more than 5 percent of the issuer's outstanding float, the Defendants deceived the public, brokers, and regulators by knowingly avoiding the disclosure obligations of Section 13(d) of Exchange Act, which would have informed investors of their control of the issuers.[4]

37.     Once the Defendants had obtained and deposited the shares of an issuer, they clandestinely funded promotional campaigns – often emails sent to potential investors that promoted the stock as a good investment, online banner ads, or websites for the issuer created or designed by the Defendants.  The purpose of these activities was to increase investor interest and encourage investors to buy the stock.

38.     For example, Lehner, Sario and Vasseur funneled funds to stock promoters

---

[4]     Section 13(d) of the Exchange Act requires a person or a group of person who acquire beneficial ownership of more than 5 percent of a voting class of a company's equity securities registered under Section 12 of the Exchange Act to file a Schedule 13D with the Commission, which is publicly available via EDGAR.

McKnight and Wise who then funneled payments from an offshore bank account in the name of an offshore entity controlled by Sario, to pay for promotions of at least six of the Relevant Issuers (BKIT, BLTO, DRNG, HZNM, ORRP, and PSNP).  Adding an additional level of obfuscation, in the promotions themselves and in communications with the promoter, McKnight used fabricated names as the paying entities for these promotions.  For other issuers, the promotions were funded in a similarly circuitous manner.

39.     Calabrigo, working with the Antevorta group, funded promotions of DRNG, VIBI, ZENO and BKIT.

40.     In addition to the promotions, the Defendants also used several other methods to fraudulently increase investor interest and demand for the Relevant Issuers' securities.  In connection with IWMG, PSNP, and ORRP, for example, Lehner, Sario and Vasseur engaged "boiler rooms" to hype the stock they planned to sell.

41.     For all of the issuers except IWMG, certain Defendants and associates also engaged in manipulative trading, sometimes described as "building a chart," in order to create the appearance of greater market interest in the stock before and during their stock promotions, and thereby induce members of the public to purchase the stocks.  Specifically, on behalf of the Defendants, the Offshore Trading Platforms often traded stock in the Relevant Issuers amongst each other, entering orders to buy and sell at the same time, at the same or similar price and quantity.  This manipulative trading often constituted the majority of the trading volume for the day.  On other occasions, third parties paid by the Defendants engaged in the manipulative trading.

42.     After creating public interest in the Relevant Issuers, creating liquidity and causing the stock price to rise, the Defendants and associates liquidated (or "dumped") their holdings of the issuers' stock via the Offshore Trading Platforms.

43.     These stock sales were not registered with the Commission, and no exemption to the Securities Act's registration requirements was applicable to the sales.  Before selling stock, control persons are required to: (a) register the stock with the Commission pursuant to Section 5 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. § 240.144], which include limitations on the amount of stock a control person can legally sell.  Such registration requirements and resale restrictions are critical safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

44.     The Defendants used a network of conduit entities and bank accounts, mostly offshore, to distribute the proceeds of these sales.  Sometimes, they funneled sale proceeds directly to a promoter in furtherance of another pump and dump.  Sario and Calabrigo often used fake invoices and consulting agreements to obfuscate the reason for payments to them of their trading proceeds, and then distributed funds to the other Defendants from offshore bank accounts that they controlled.

45.     The involvement of each Defendant varied by issuer, as reflected in Chart A below, but their roles were generally as follows:

- Lehner and Vasseur were particularly instrumental in setting up the schemes, *i.e.*, gaining control of the issuers and coordinating the promotions.  Vasseur also played a role in designing or reviewing promotional materials and

websites, and coordinated with McKnight concerning some promotions.

- Sario had a significant role in directing the Defendants' trading in the stock of the Relevant Issuers.  In addition, his offshore bank accounts were used to fund promotions and to funnel money to the Defendants and others who aided them.

- Calabrigo's participation generally related to promotions, specifically for BKIT, DRNG, VIBI and ZENO.  Calabrigo was also associated with Antevorta, a group working through a British Virgins Island entity that also engaged in the manipulation of microcap stocks, often in concert with the Defendants.

46.     The following chart identifies the Defendants involvement in each of the nine pump-and-dump schemes, and the approximate net proceeds that these Defendants realized from that scheme:

**CHART A**

| Ticker | Time Frame of Sales by Defendant(s) | Defendants Involved | Approximate Net Shares Sold | Approximate Net Proceeds |
|---|---|---|---|---|
| IWMG | January-March 2016 | Lehner, Sario | 1.12 million shares | $730,000 |
| PSNP | February-August 2016 | Lehner, Vasseur, Sario | 4.05 million shares | $1.64 million |
| ORRP | Late February-Late September 2016 | Lehner, Vasseur, Sario | 11.9 million shares | $12.4 million |
| BKIT | November 2016-July 2017 | Lehner, Vasseur, Sario, Calabrigo | 5.57 million shares | $5.1 million |
| HZNM | December 2016-February 2017 | Lehner, Vasseur, Sario | 1.05 million shares | $1.3 million |
| BLTO | January-June 2017 | Lehner, Vasseur, Sario | 1.35 million shares | $2,.4 million |
| DRNG | Late March 2017-April 2018 | Lehner, Vasseur, Sario, Calabrigo | 22.6 million shares | $4.2 million |
| ZENO | Mid-February -Mid-April 2017 | Lehner, Vasseur, Calabrigo | 6.32 million shares | $7.8 million |
| VIBI | Late May 2017- | Lehner, Vasseur, | 8.44 million | $4.04 million |

| Ticker | Time Frame of Sales by Defendant(s) | Defendants Involved | Approximate Net Shares Sold | Approximate Net Proceeds |
|--------|-------------------------------------|---------------------|-----------------------------|--------------------------|
|        | December 2018                       | Sario, Calabrigo    | shares                      |                          |
| TOTAL  |                                     |                     |                             | $39.6 million            |

47.     Three examples of the Defendants' pump-and-dump schemes are discussed in more detail below.  These three examples are representative of the nine schemes.

**The BKIT Pump and Dump**

48.     From November 2016 through mid-2017, all four Defendants and an associate ("Associate A", who, together with the Defendants and others, was part of an undisclosed control group), engaged in a pump-and-dump scheme involving the stock of BKIT, a shell company whose stock had been acquired by Lehner and Associate A in late 2013-early 2014.

49.     Through a series of transfers from February 2014 through early 2017, Defendants and their associates gained control of BKIT's float, so that by 2017, this undisclosed control group had deposited 99.99% of BKIT's unrestricted stock – approximately 10.6 million shares - with offshore brokers.  All the shares were ultimately transferred to entities on the Blacklight and Bajic-Taneja platforms that were controlled by this undisclosed control group.  No single entity held more than 5 percent of BKIT's outstanding shares.  By virtue of their control of BKIT, Defendants were affiliates of BKIT, as that term is defined in Commission Rule 144(a)(1) [17 C.F.R. §144(a)(1)].

50.     Beginning in November 2016 and continuing through January 2017, the Defendants began to direct trading activity between the Offshore Trading Platforms, to create the appearance of liquidity in advance of a paid promotional campaign, *i.e.*, "building the chart."

51.     Specifically, on at least 18 trading days between November 14, 2016 and January 26, 2017, brokerage accounts associated with the Offshore Trading Platforms were buying and

selling BKIT stock on the same day.  For example, on November 14, 2016, a Blacklight account purchased 50,700 shares of BKIT while a Bajic-Taneja account sold 56,900 shares of BKIT. The reported total market volume for BKIT was only 59,800 shares that day.   The Defendant's manipulative trading activity in BKIT is set forth in detail in pages 1-2 of Exhibit A.

52.    Another associate of the Defendants, Associate B, also traded in BKIT in advance of the promotion.[5]

53.    From January 2017 through March 2017, the Defendants promoted BKIT to investors through an email promotional campaign.  In anticipation of, and during, the promotional campaign, the Defendants wired at least $25,000 to BKIT's CEO.

54.    Vasseur helped write the text of the promotional materials for the BKIT campaign.  In addition, Lehner and Vasseur provided McKnight with fictitious names to send to the stock promoter to be used on the stock promotions.  Promotional emails touting BKIT promised exceptional returns, suggesting that early investors could earn over 15,000% on their investment in BKIT.  These emails did not disclose that a coordinated group of individuals, including the Defendants controlled BKIT, were responsible for the promotional campaign, and were selling their shares during the promotion.  The promotional campaign was paid for via Sario's offshore entity.

55.    The Defendants also directed BKIT to issue press releases to coincide with this promotional campaign, including a January 17, 2017 press release stating that BKIT was seeking financing for clinical trials, and press releases on February 8 and 24, 2017 concerning a purported joint venture with a consulting firm.  The company also filed a Form 8-K on January

---

[5]    In October 2016, Associate B received a payment, routed through an intermediary, funded by a company controlled by Vasseur and Lehner.  Shortly after the funds were deposited in his brokerage account, Associate B purchased shares of ORRP, BKIT, and HZNM.  Associate B also traded in ZENO in advance of its promotional campaign, as well as in VIBI, as described in paragraph 79 below.

26, 2017 acknowledging promotional activity in the stock but falsely disclaiming involvement in it.

56.     In late April through early May 2017, the Defendants again directed manipulative trades in BKIT to create trading activity in the stock.  This trading activity is set forth in detail in page 2 of Exhibit A.

57.     In May 2017, Calabrigo, through an associate, paid for a different stock promoter to promote BKIT through Facebook and Google ads.

58.     The effect of the promotional activity and manipulative trading is evident in the chart below, which sets forth BKIT's price and trading volume from October 3, 2016 through August 31, 2017:



59.     From January 9 through July 10, 2017, the Offshore Trading Platforms, including

Blacklight accounts associated with the Defendants, sold a net total of over 5.5 million shares of BKIT for proceeds of over $5 million.

60.     No registration statement existed for the Defendants' sales of these shares of BKIT and no exemption to the Securities Act's registration requirements applied to the sales. The Defendants' sales also did not satisfy the conditions of the safe harbor from registration provided by Commission Rule 144.

**The BLTO Pump and Dump**

61.     In early 2017, Defendants Lehner, Vasseur, Sario and Associate A engaged in a pump and dump of the securities of BLTO.

62.     Defendants Lehner, Vasseur and Sario were part of an undisclosed control group that gained control of BLTO's public float in or around February 2017, through a series of purported convertible debt agreements and nominee sales involving, among other entities, corporations controlled by Lehner and Sharp.

63.     By the time the undisclosed control group began to manipulate BLTO, this control group owned approximately 96% of BLTO's public float.  All the shares were ultimately transferred to entities on the Blacklight and Bajic-Taneja platforms that were controlled by this undisclosed control group.

64.     Defendants' control of BLTO is further evidenced by Lehner's prior relationship to the company.  Specifically, on March 31, 2016, a company controlled by Lehner and an associate had transferred at least $14,000 to BLTO (f/k/a Indie Growers Association).

65.      By virtue of their control of BLTO, Defendants and their associates were affiliates of BLTO, as that term is defined in Commission Rule 144(a)(1) [17 C.F.R. §144(a)(1)].

66.     Prior to promoting BLTO, and during the early stages of their promotion of

BLTO, Defendants Lehner, Vasseur and Sario and Associate B engaged in a series of manipulative trades of BLTO shares.  These trades were effected to build BLTO's chart, and to create trading volume and interest in the stock.

67.     For example, trading associated with Blacklight, Bajic-Taneja and Associate B accounts occurred on both the buy-side and sell-side on at least four different dates leading up to and during the BLTO promotion.  On one of those dates, January 23, 2017, the total reported market volume in BLTO stock was 31,463. Blacklight buying accounted for 30,276 shares (96%) and Blacklight and Associate B selling accounted for 30,463 shares (97%).  A chart of the Defendants' manipulative trading in BLTO is set forth in pages 2-3 of Exhibit A.

68.     In advance of a promotional campaign, in January and early March, 2017, BLTO issued press releases promoting the company.  On January 18, 2017, BLTO issued press releases claiming that its technology had received a certification from the "Gaming Laboratories International LLC" and on March 9, 2017, the company announced that it "was accelerat[ing] rollout of its technology by awarding distribution rights to strategic partners in up to 29 states where Indian gaming is conducted."  These press releases were prepared by a public relations firm that was compensated by a wire sent from an offshore account in the name of an entity associated with Lehner and Vasseur.

69.     In mid-March 2017, Defendants Lehner, Vasseur and Sario ran a promotional campaign of BLTO, funded by a wire from the Bajic-Taneja Platform to Sario's offshore entity, which then wired these funds, through conduits, to the promoters.

70.     The promotions touted BLTO's attractiveness as an investment, claiming, among other things, that it could be on the "start of an insane bull run," that BLTO's gaming kiosks could generate "$30 million per week" in revenue and an investment of $2,000 could turn into

"$26,880." These promotions did not disclose that the Defendants were paying for the promotions, or that the parties paying for the promotions were part of an undisclosed control group that owned the vast majority of the public float of the company and were selling the stock while encouraging potential investors to buy it.

71.     The effect of the manipulative trading and the promotional activity is evident in the chart below, which shows BLTO's volume (bar) and price (line) from January 18 through May 31, 2017:



72.     From January 19 through April 11, 2017, BLTO's undisclosed control group, including Lehner, Sario, and Vasseur, sold net 1,189,705 shares of BLTO on the Bajic-Taneja and Blacklight Platforms for proceeds of $2,362,795.

73.     No registration statement existed for the Defendants' sales of these shares of BLTO, and no exemption to the Securities Act's registration requirements applied to the sales. The Defendants' sales also did not satisfy the conditions of the safe harbor from registration provided by Commission Rule 144.

74.     The Defendants' pump and dump was interrupted when the Commission suspended trading in BLTO on April 13, 2017.  The Commission's suspension order cited "concerns regarding the accuracy and adequacy of publicly available information in the marketplace and potentially manipulative transactions in Bingo Nation's common stock."[6]

**The VIBI Pump and Dump**

75.     Beginning in late 2017 and throughout 2018, Defendants Calabrigo, Lehner, Sario and Vasseur, along with Associate A and other associates engaged in a pump and dump of the securities of VIBI, a purported skin care company.

76.     The Defendants and their associates began acquiring ownership of VIBI's float beginning in September 2016 by transferring shares from the nominee shareholders identified on a Form S-1 filed by VIBI's predecessor entity to entities controlled by the Defendants and their associates.  By January 2017, this control group controlled 57% of VIBI's public float, and by March 2017, the group controlled 69% of the public float.  By September 2017, this control group controlled 82% of VIBI's public float.  All the shares were ultimately transferred to entities on the Blacklight and Bajic-Taneja platforms that were controlled by this undisclosed control group.  No single entity held more than 5 percent of VIBI's outstanding shares.

77.     In addition to controlling the float, Vasseur provided feedback regarding content to add to VIBI's corporate website, which was relayed to and accepted by VIBI's CEO.

---

[6]     https://www.sec.gov/litigation/suspensions/2017/34-80445-o.pdf

78.     By virtue of their control of VIBI, Defendants and their associates were affiliates of VIBI, as that term is defined in Commission Rule 144(a)(1) [17 C.F.R. §144(a)(1)].

79.     As they did in the BKIT and BLTO, in anticipation of a promotional campaign, from June through mid-September 2017, the Defendants directed manipulative trading in VIBI to build a chart and to create trading volume and interest in the stock.  The trading involved the Offshore Trading Platforms, as well as other associates of the Defendants, including Associate B; an associate who had received several payments from Sario totaling $235,000 to trade in stocks (Associate C)[7]; and an associate of Lehner (Associate D)[8].

80.     For example, on at least 40 trading days between June 1, 2017 and September 12, 2017, brokerage accounts associated with the Offshore Trading Platforms controlled by the Defendants and the Defendants' Associates executed trades on both the buy side and sell side for VIBI stock.  Overall trading volume during this period of time was very light, so the group accounted for a substantial portion of the overall trading volume.  In fact, on 12 of the trading days during this period of time, the Defendants and Associates accounted for the entire market volume of trading in VIBI.  A chart of the Defendants' manipulative trading in VIBI is set forth in pages 3-6 of Exhibit A.From October 2017 and through 2018, the Defendants and associates of Calabrigo promoted VIBI through a landing page websites, promotional emails, and other internet advertising campaigns.  Calabrigo's associates paid over $1 million to a stock promoter to promote VIBI.

81.     Promotional materials for VIBI encouraged investors to purchase VIBI, claiming:

•     "I've Never Seen a Better Opportunity than Vilacto Bio (OTC:VIBI)!";

•     "YOUR $5,000 INVESTMENT IN VILACTO BIO [STOCK SYMBOL 'VIBI']

---

[7]     Associate C also traded in HZNM, BLTO, and DRNG in advance of the promotional campaigns.
[8]     Associate D also traded in HZNM, BKIT, and DRNG in the months preceding the promotional campaigns of these stocks.

COULD TURN INTO $35,000 WITHIN 10 MONTHS!"; and

- "Hot Stock Alert – VIBI – Read the Full Story on 2017's 'Under the Radar' Stock About to Explode."

The promotions, like the BKIT and BLTO promotions, did not disclose that the parties paying for the promotions owned the majority of the stock and were selling the stock while encouraging potential investors to buy it.

82.     The effect of the chart building and promotional activity is evident in the following chart, which show's VIBI's price and volume from May 25, 2017 through January 25, 2019:



83.     From late May 2017 through September 2018, the Defendants, along with

Calabrigo's associates, sold net 8,456,665 shares of VIBI for proceeds of $4,048,083.

84.     No registration statement existed for the Defendants' sales of these shares of VIBI and no exemption to the Securities Act's registration requirements applied to the sales.  The Defendants' sales also did not satisfy the conditions of the safe harbor from registration provided by Commission Rule 144.

### FIRST CLAIM FOR RELIEF
**Violations of Securities Act Sections 17(a)(1) and 17(a)(3)**
**(All Defendants)**

85.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

86.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, and/or knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

87.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

### SECOND CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder**
**(All Defendants)**

88.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

89.     Defendants, directly or indirectly, singly or in concert, in connection with the

purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud, and engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

90.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### THIRD CLAIM FOR RELIEF
**Violations of Exchange Act Section 9(a)(2)**
**(All Defendants)**

91.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

92.     Defendants, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

93.     By reason of the foregoing, Defendants directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

### FOURTH CLAIM FOR RELIEF
**Violations of Securities Act Sections 5(a) and (c)**
**(All Defendants)**

94.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

95.     Defendants, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

96.     By reason of the foregoing, Defendants violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**FIFTH CLAIM FOR RELIEF**
**In the Alternative to the First Claim of Relief,**
**Aiding and Abetting Violations of Securities Act Section 17(a)(1) and 17(a)(3)**
**(All Defendants)**

97.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

98.     Calabrigo, Lehner, Sario and Vasseur and certain of their associates directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: with scienter, employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

99.     Calabrigo, Lehner, Sario and Vasseur knowingly or recklessly provided substantial assistance to each other and their associates with respect to their violations of

Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. § 77q(a)(1) and (3)].

100.    By reason of the foregoing, Defendants are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting each other's violations of Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)] and, unless enjoined, Defendants will again aid and abet these violations.

**SIXTH CLAIM FOR RELIEF**
**In the Alternative to the Second Claim of Relief,**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c))**
**(All Defendants)**

101.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

102.    Calabrigo, Lehner, Sario and Vasseur, and their associates, directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, employed devices, schemes and artifices to defraud, or engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon investors.

103.    Calabrigo, Lehner, Sario and Vasseur knowingly or recklessly provided substantial assistance to each other and their associates with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

104.    By reason of the foregoing, Defendants are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting each other's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder and, unless enjoined, Defendants will again aid and abet these violations.

**SEVENTH CLAIM FOR RELIEF**
**In the Alternative to the Third Claim of Relief,**
**Aiding and Abetting Violations of Exchange Act Section 9(a)(2)**
**(All Defendants)**

105.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

106.    Calabrigo, Lehner, Sario, and Vasseur, and their associates, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

107.    Calabrigo, Lehner, Sario and Vasseur knowingly or recklessly provided substantial assistance to each other and their associates with respect to its violations of Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)] thereunder.

108.    By reason of the foregoing, Defendants are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting each other's violations of Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)] and, unless enjoined, Defendants will again aid and abet these violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or

indirectly, Securities Act Sections 5(a) and (c), and 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1) 77q(a)(3)], Exchange Act Sections 9(a)(2) and 10(b) [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rule 10b-5(a) and (c)) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## II.

An Order directing the Defendants, and each of their financial and brokerage institutions, agents, servants, employees attorneys-in-fact, and those persons in active concert or participation with them, who receive actual notice of such Order by personal service, facsimile service, or otherwise, to hold and retain within their control, and otherwise prevent, any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever) of, held by, or under the control of the Defendants, whether held in their names or for their direct or indirect beneficial interest wherever situated;

## III.

An Order directing the Defendants to file with this Court and serve upon the Commission, within three (3) business days, or within such extension of time as the Commission staff agrees to, sworn accountings, signed by the Defendants, under penalty of perjury, setting forth:

(1) All assets, liabilities and property currently held, directly or indirectly, by or for the benefit of each such Defendant, including, without limitation, bank accounts, brokerage accounts, investments, business interests, loans, lines of credit, and real and personal property wherever situated, describing each asset and liability, its current location and amount;

(2) All money, property, assets and income received by Defendants for their direct or indirect benefit, at any time from January 1, 2016, through the date of such accounting, describing the source, amount, disposition and current location of each of the items listed;

(3) The names and last known addresses of all bailees, debtors, and other persons and entities that currently are holding the assets, funds or property of such Defendants; and

(4) All assets, funds, securities, and real or personal property received by such

Defendants, or any other person controlled by them, from persons who provided money to such Defendants in connection with the offer, purchase or sale of securities, from January 1, 2016 through the date of such accounting, and the disposition of such assets, funds, securities, real or personal property;

## IV.

An order prohibiting Defendants from altering, destroying, or concealing documents, including documents concerning allegations of the Complaint or the assets or finances of any of the Defendants;

## V.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7);

## VI.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## VII.

Permanently prohibiting Defendants from participating in any offering of a penny stock,

including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading,

or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act

Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## VIII.

Granting any other and further relief this Court may deem just and proper.


Dated: New York, New York
April 14, 2022

*Lara S. Mehraban*

LARA S. MEHRABAN
ACTING REGIONAL DIRECTOR
Thomas P. Smith, Jr.
Michael D. Paley
Judith A. Weinstock
Paul G. Gizzi
Kristine M. Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, New York 10004-2616
(212) 336-0077
gizzip@sec.gov