UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__7/11/2022__

-------------------------------------------------------------------X
                                                                  :
SECURITIES AND EXCHANGE COMMISSION,               :
                                                                  :
                    Plaintiff,                                    :
                                                                  :
                                                                  :            22-cv-3096 (LJL)
          -v-                                                     :
                                                                  :         MEMORANDUM AND
DOMENIC CALABRIGO, CURTIS LEHNER, HASAN :                ORDER
SARIO, and COURTNEY VASSEUR,                          :
                                                                  :
                    Defendants.                                  :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

     Plaintiff, the United States Securities and Exchange Commission ("SEC"), moves by

order to show cause for a preliminary injunction effecting a freeze of the assets of defendant

Hasan Sario ("Sario"); requiring repatriation and an accounting; and restraining Sario from

destroying, altering, or concealing documents that may be relevant to the case.  Dkt No. 14.  By

separate orders, the other defendants in this case—Domenic Calabrigo, Curtis Lehner, and

Courtney Vasseur (together with Sario, "Defendants")—either have consented to preliminary

injunctive relief and an asset freeze or else have not opposed the SEC's request for such relief

and, accordingly, have been restrained from dissipating assets that could be used to satisfy a

judgment in this case.

## BACKGROUND

     This action was filed on April 14, 2022.  Dkt. No. 1.  The complaint alleges that the

Defendants engaged in a pump-and-dump scheme to defraud investors and to manipulate the

stock of at least nine microcap issuers (the "Relevant Issuers"): Blake Therapeutics Inc.

("BKIT"); Bingo Nation, Inc. ("BLTO"); Drone Guarder, Inc. ("DRNG"); Horizon Minerals

Corp. ("HZNM"); I-Wellness Marketing Group Inc. ("IWMG"); Oroplata Resources Inc.

("ORRP"); Preston Corp. ("PSNP"); Vilacto Bio, Inc. ("VIBI"); and Zenosense, Inc. ("ZENO").

*Id.* ¶¶ 1–2, 23.

## I.     Details of the Alleged Scheme

The scheme followed a familiar pattern.  Defendants and their associates obtained a

controlling interest in the securities of one of the Relevant Issuers through a series of transfers

and purchase agreements with nominee shareholders.  *Id.* ¶ 2.  They then used a network of

offshore entities and brokerage accounts ("Offshore Trading Platforms") to deposit the shares in

mostly offshore brokerage firms and in accounts not in their own names but in the names of the

Offshore Trading Platforms or nominee entities.  *Id.* ¶¶ 2, 24.  They engaged in promotional

activity such as sending emails and setting up websites touting the stocks to generate interest

among investors and market liquidity into which they sold their shares.  *Id.* ¶¶ 5, 37–38.  They

also directed trading activity to increase trading volume and to generate a contrived appearance

of active investor interest in the issuer.  *Id.* ¶¶ 7, 41.  After the "pump," Defendants "dumped"

their stock in violation of registration requirements of the federal securities laws, yielding

millions in profits.  *Id.* ¶¶ 8, 11, 42.

All of this conduct was engaged in clandestinely.  Not only were the shares held and

traded through nominee accounts that were not in the Defendants' own names and that were

virtually untraceable to Defendants, *id.* ¶¶ 2, 32, but Defendants sought to hide their control of

the Relevant Issuers by dividing up the shares in separate accounts so that none of the accounts

held more than five percent of the issuer's outstanding float, *id.* ¶¶ 3, 35–36.  The Defendants

also used conduit entities to pay stock promoters; none of the promotional materials disclosed

that the promotions were funded by people who controlled the relevant issue and who would be

selling their stock during the "pump." *Id.* ¶¶ 6, 37. The sales proceeds were distributed through a network of conduit entities and bank accounts, including through the use of take invoices and consulting agreements. *Id.* ¶ 44. The Defendants frequently used encrypted messaging and email applications with code names to communicate with each other, associates, and the Offshore Trading Platforms. *Id.* ¶ 29.

The SEC alleges that the involvement of each Defendant varied by issuer. *Id.* ¶ 45. Generally, Lehner and Vasseur were instrumental in setting up the schemes; in addition, Vasseur played a role in designing or reviewing promotional materials and websites. *Id.* Calabrigo's role generally related to promotions. *Id.* Sario had a significant role in directing the Defendants' trading in the stock of the Relevant Issuers, and his offshore bank accounts were used to fund promotions and to funnel money to the Defendants and their aiders and abettors. *Id.* In total, the four Defendants netted $39.6 million from the scheme. *Id.* ¶ 46. The manipulation of the stocks in which Sario was involved netted $31.8 million. Dkt. No. 14 at III.

## II. Procedural History

On April 15, 2022, the Court granted the SEC's ex parte application for an order to show cause, temporary restraining order, and order freezing assets ("TRO"). *Id.* Upon the Court's finding that it appeared from the evidence that the Defendants violated Sections 17(a)(1) and (3) of the Securities Act of 1933, 15 U.S.C. §§ 77q(a)(1) and (3) (the "Securities Act"); Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(a)(2) and 78j(b) (the "Exchange Act"); and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c), the Order (1) froze Defendants' assets up to $39.6 million (up to $31.8 million for Sario) and required Defendants to repatriate funds and assets located outside of the United States, prohibited the destruction of relevant documents, and required the Defendants to provide accountings of

3

their assets; and (2) directed Defendants to show cause why an order should not be entered providing such relief on a preliminary basis pending the final disposition of the action.  Dkt. No. 14.

The Order to Show Cause originally was returnable on April 29, 2022.  Dkt. No. 14.  The Court five times adjourned the hearing on the preliminary injunction and extended the TRO for good cause and on consent.  On April 25, 2022, the Court adjourned the preliminary injunction hearing and extended the TRO to May 13, 2022.  Dkt. No. 24.  On May 6, 2022, the Court adjourned the preliminary injunction hearing to May 20, 2022, and extended the TRO to May 27, 2022.  Dkt. No. 38.  On May 16, 2022, the Court adjourned the preliminary injunction hearing to June 3, 2022, and extended the TRO to June 10, 2022.  Dkt. No. 43.  On June 1, 2022, the Court adjourned the preliminary injunction hearing to June 17, 2022, and extended the TRO to June 24, 2022.  Dkt. No. 45.  And on June 13, 2022, the Court adjourned the preliminary injunction hearing to June 30, 2022, and extended the TRO to July 1, 2022.  Dkt No. 50.

The Court held a telephonic hearing on the motion for a preliminary injunction on June 30, 2022.[1]  The SEC relied upon the declaration and its attachments that it submitted in connection with the TRO, Dkt. No. 6, as well as on the inferences that could be drawn from Sario's assertion of his privilege under the Fifth Amendment to the United States Constitution in response to the order for an accounting.  Sario challenged the sufficiency of the SEC's showing but did not offer any evidence of his own.  In advance of the hearing, the Court received a Response to Order to Show Cause from Sario, Dkt. No. 56, and a reply memorandum of law from the SEC, Dkt. No. 62.  At the conclusion of the hearing and on consent, the Court extended

---

[1] The parties consented to proceeding by telephone.

the TRO until a decision on the motion for a preliminary injunction and took the motion under advisement.

### III.     Evidence in Support of the Preliminary Injunction

The sole evidence SEC proffers in support of the preliminary injunction and the asset freeze is the declaration of Trevor T. Donelan ("Donelan") and the exhibits attached to that declaration. Dkt. No. 6 ("Donelan declaration").  The SEC declined to submit additional evidence or to call Donelan to testify.  Sario declined to offer evidence in opposition to the request for the preliminary injunction.

Donelan is an Enforcement Accountant with the SEC who has been involved with numerous investigations regarding microcap trading using Offshore Trading Platforms since February 2017.  *Id.* ¶¶ 1, 5.  He declares that the investigations have resulted in civil actions against at least seven other individuals, *id.* ¶¶ 6–7, 27, 49, 51, and that his knowledge is based on the review of relevant documents and data and his attendance at witness interviews and during testimony, *id.* ¶¶ 8–10.  Donelan lays out relevant facts regarding the schemes to manipulate each of the nine microcap securities.  In each instance, records reflect that shares of the Relevant Issuers were initially transferred into accounts in the names of nominee entities provided by or associated with the Offshore Trading Platforms. *Id.* ¶¶ 13, 26, 37, 47, 49, 56, 62, 68, 77, 86. According to bank records and records provided by promotional firms, one of two United States promotional firms then engaged in promotional campaigns on behalf of the Relevant Issuers in exchange for payments—including payments made by accounts associated with one of the Defendants.  *Id.* ¶¶ 17, 20–21, 33, 44, 47, 50, 57, 63, 73, 79.  Donelan also swears to the content of brokerage records he has reviewed that show trading in the shares of the Relevant Issuers; emails he has reviewed that show the involvement of various Defendants in the promotional

activities; and bank, brokerage, and accounting records that show the disposition and use of the proceeds of the trades, including for payments that benefitted certain Defendants or that were used to reinvest in the scheme. *See generally* Dkt. No. 6.

The SEC's claim for relief against Sario turns in large part on the assertion that he was "associated" with a Singapore bank account held in the name of Lion Sate Capital Pte. Ltd ("Lion State") and with the activity in that account (the "Lion State Account"). *Id.* ¶ 19. Donelan states that "[b]ased on my review of the activity in this account and interviews with a witness in this matter, I understand that the Lion State Account was associated with Defendant Sario." *Id.* He then recites that proceeds of the allegedly manipulative activity from BKIT and HZNM were paid to Lion State and wired to Stock Promotion Firm A to fund a promotional campaign on BLTO, *id.* ¶ 32; that money wired from the Lion State Account was used "to trade in several of the Relevant Issuers in advance of the promotional campaigns including: HZMN, BLTO, DRNG and VBI," *id.* ¶ 40; that "[a]t least some of the payments to Stock Promotion Firm A [in connection with its campaign to tout ORRP] were funded using the Lion State Account linked to Defendant Sario," *id.* ¶ 50; that that proceeds from the sale of shares of ORRP were made "to the Lion State Account associated with Defendant Sario," *id.* ¶ 53; that "[a]t least some of the payments to Stock Promotion Firm A [for the promotion of PSNP] were funded using the Lion State [A]ccount linked to Defendant Sario," *id.* ¶ 57; that trading proceeds from trades in HZNM "were wired to the Lion State Account . . . and ultimately wired to Stock Promotion Firm A to fund a promotional campaign touting HZNM," *id.* ¶ 63; that proceeds from trade in DRNG "were wired to the Lion State Account and ultimately routed to Stock Promotion Firm A to fund a promotional campaign touting DRNG," *id.* ¶ 71. The remainder of the SEC's evidence against Sario is based on his invocation of the Fifth Amendment or in the form of general, conclusory

statements based on unidentified witnesses.

The Donelan declaration also refers to "an interview of Associate C," in which Donelan participated and which forms part of the basis for his knowledge. *Id.* ¶ 40. But Donelan simply states that Associate C was "paid to help establish a relationship with U.S. market makers to facilitate the liquidation of microcap stock," and that he "knew he was hired by someone using the nickname 'H' who was in his 40s and lived in Turkey and Switzerland—consistent with Defendant Sario." *Id.* Donelan declares that Associate C "explained that 'H,' using encrypted chat applications, provided advance notion of promotional campaigns and . . . used the money wired from the Lion State Account to trade in several of the Relevant Issuers in advance of the promotional campaigns including: HZNM, BLTO, DRNG and VIBI." *Id.* The Donelan declaration contains the assertion—based on a review of documents and witness interviews— that Sario is age 48, resides in Turkey, and has an address in Switzerland. *Id.* ¶ 4(a). But it contains no additional detail regarding "Associate C."

## DISCUSSION

The parties are in substantial agreement on the standards applicable to this motion. District courts enjoy "general equity powers" under Section 22(a) of the Securities Act and Section 27 of the Exchange Act that are "invoked by a showing of a securities law violation." *Smith v. S.E.C*, 653 F.3d 121, 127 (2d Cir. 2011) (quoting *S.E.C v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972)). "'[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances.'" *Id.* (quoting *S.E.C v. Materia,* 745 F.2d 197, 200 (2d Cir.1984)). Such relief includes an asset freeze, a repatriation order, and an impoundment of assets. *Id.*

The SEC need not make as substantial a showing to obtain an asset freeze as it must to

obtain a preliminary injunction.  To obtain an order enjoining the defendant against future securities law violations, the SEC "has to make a substantial showing of likelihood of success as to both a current violation and the risk of repetition."  *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1040 (2d Cir. 1990).  "Though the order is prohibitory in form, rather than mandatory, it accomplishes significantly more than preservation of the status quo."  *Id.*  By contrast, to permit a freeze order—particularly one of "limited duration"—the SEC is held to a lesser burden; it need only show that there is "a basis to infer" that the defendant has engaged in a violation of the securities laws.  *Id.* at 1041; *see S.E.C. v. Jafar*, 2015 WL 3604228, at *7 (S.D.N.Y. June 8, 2015) ("Where an asset freeze is requested, however, the standard is lower: the SEC must show only 'either a likelihood of success on the merits, *or* that an inference can be drawn that the party has violated the federal securities laws.'" (quoting *Smith,* 653 F.3d at 128)); *S.E.C. v. Byers*, 2009 WL 33434, at *3 (S.D.N.Y. Jan. 7, 2009) ("To obtain an asset freeze either against a party accused of actual wrongdoing or a relief defendant, the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws.").

An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event that the SEC obtains a judgment, money will be available to satisfy that judgment.  *See Unifund SAL,* 910 F.2d at 1041. In this respect, an asset freeze "functions like an attachment." *Id.*  Perhaps for this reason, the SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an injunction.  *See id.* ("[A]n ancillary remedy [such as an asset freeze] may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established."); *S.E.C v. Gonzalez de Castilla,* 145 F.Supp.2d 402, 419 (S.D.N.Y. 2001) (noting the "lesser standard applicable for extending the asset freeze").  In

addition, "an accounting is appropriate where it is necessary to determine the amount of profits reaped from allegedly unlawful sales, the present location of such proceeds, or the defendant's ability to repay . . . . Such relief is minimally intrusive. *S.E.C. v. Spongetech Delivery Sys, Inc.*, 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (internal quotation marks and citation omitted). Moreover, a provision prohibiting disposition or alteration of the defendant's books and records generally is "innocuous." *Unifund SAL*, 910 F.2d at 1040 n.11.

At this phase, "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction. The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). Thus, the Court may consider the factors for assessing the credibility and weight to be accorded any witness testimony including the identity of the witness and whether he or she has a motive or interest in the outcome, the basis of the witness' testimony and whether she had an opportunity to observe the matter about which she is testifying, the detail provided by the witness, and whether the testimony is corroborated by other evidence or is inconsistent or has been contradicted. It also is relevant whether the witness' testimony has been challenged through the fulcrum of cross-examination and whether the subject of the testimony involves facts about which "there is no serious dispute" or, to the contrary, whether the testimony "turns on what happened and that is in sharp dispute." *S.E.C. v. Frank*, 388 F.2d 486, 491 (2d Cir. 1968) (Friendly, J). In the latter circumstance, live testimony and cross-examination are particularly helpful to "illuminate the factual issues." *Id.*

The evidence here does not provide the Court a sufficient basis to infer that Sario was involved in the fraudulent conduct necessary to support even an asset freeze. In large part, it requires the Court simply to accept Donelan's say-so that Sario was involved in the scheme; the

SEC provides no basis upon which the Court can judge the credibility or weight of the evidence upon which Donelan relies.  For example, the evidence linking Sario to the Lion State Account is remarkably thin.  Donelan states that "[b]ased on [his] review of the activity in this account and interviews with a witness in this matter," he "understand[s] that the Lion State Account was associated with Defendant Sario."  *Id.* ¶ 19.  Donelan's declaration is accorded some weight because he is an SEC Enforcement Accountant with presumably no motive or interest in the case.[2]  But Donelan does not state in what respect Sario was associated with the Lion State Account—whether Sario had control over the account or the ability to direct activity in the account, whether he was a beneficiary of the account, or whether he was just listed on the account in some other capacity, with no ability to control or to benefit.  At argument on the preliminary injunction, counsel for the SEC did not offer any further elaboration.  Nor does Donelan indicate what he saw from the activity in the account that led him to draw the inference that Sario was associated with the account (much less provide the account documents so that the Court can make its own evaluation of whether the documentary evidence would support Donelan's conclusion).  Donelan does state that his conclusion is based on "interviews with a witness in this matter," but there is no indication of who the witness is, what the witness said, how the witness was in a position to know that Sario was associated with the Lion State Account, whether his information was based on first-hand knowledge or hearsay, why Donelan found the witness to be credible, or why the Court should find the witness to be credible.

The Donelan declaration also refers to "an interview of Associate C," in which Donelan

---

[2] It also is reasonable to infer from Donelan's declaration that the information he relies upon has resulted in complaints being brought against others, but the declaration offers no information regarding whether those allegations have resulted in verdicts or settlements or were credited by any factfinder.

participated and which forms part of the basis for his knowledge, but that paragraph also is bereft of the kind of factual assertions that could give the Court comfort in granting relief against Sario. While Donelan declares that—based on a review of documents and witness interviews—that Sario is age 48, resides in Turkey, and has an address in Switzerland, *id.* ¶ 4(a), there is no information in the declaration as to Associate C's credibility, such as: who Associate C is, how he knew he was hired by H, and whether his information about H's use of encrypted applications and involvement in the promotional campaigns was based on first-hand knowledge or is hearsay, and why Donelan found him to be credible and why the Court should find him to be credible.

The other information is equally conclusory. It refers to witness interviews, but it provides no information regarding whether the witnesses who were being interviewed conveyed first-hand information and provides no facts about the witnesses or the circumstances of their interviews from which the Court could infer that the witnesses were credible.

The Court is prepared to assume that the SEC has a legitimate interest in keeping the identities of its sources confidential, particularly at the early stage of this litigation and while a parallel criminal case is proceeding. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("Imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them."); *cf. S.E.C. v. Downe*, 1993 WL 22126, *12 (S.D.N.Y. Jan. 26, 1993) (explaining that a court must balance competing interests in considering a request for a stay of discovery, and finding that a stay in a civil case is "often necessary where liberal discovery rules will allow a litigant to undermine . . . a potential criminal prosecution which parallels the subject matter of the civil action"). However, in the somewhat analogous context where the Government in a prosecutorial capacity asks the Court to

11

credit the testimony of an anonymous informant, it offers information such as that the informant is "known for the unusual reliability of his predictions," is "an unquestionably honest citizen," provides an "explicit and detailed description of alleged wrongdoing," or was in the position to observe the event first-hand, *see Illinois v. Gates*, 462 U.S. 213, 233–34 (1983) (discussing probable-cause requirement), or it offers facts that would provide at least a "moderate indicia of reliability," *Florida v. J.L.*, 529 U.S. 266, 271 (2000) (discussing reasonable-suspicion requirement).  The SEC's accountant provides none of that assurance.

To be sure, the Court can draw an adverse inference against Sario based on his assertion of his Fifth Amendment privilege against incrimination.  *S.E.C. v. Schiffer*, 1998 WL 307375, at*1 (S.D.N.Y. June 11, 1998) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)); *S.E.C. v. Musella*, 578 F. Supp. 425, 430–31 (S.D.N.Y. 1984).  But even at trial, "'[i]f defendants choose to remain silent, the adverse inference that may be drawn will be only one of a number of factors the factfinder will consider and will be given no more weight than the facts of the case warrant.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97–98 (2d Cir. 2012) (quoting *United States v. Dist. Council of New York City*, 782 F. Supp. 920, 925–26 (S.D.N.Y. 1992)).  It may not operate as a penalty, and it is not a substitute for relevant evidence.  *Cf. Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 2022 WL 1997207, at *7 (S.D.N.Y. June 6, 2022).  Thus, where, as here, the SEC has not offered other non-conclusory evidence, the fact that Sario has invoked his Fifth Amendment privilege is not sufficient to support the imposition of an asset freeze.  However, the SEC is not entitled to a preliminary injunction as to Sario on this record.[3]

---

[3] The TRO required that an accounting be made by April 22, 2022.  Dkt. No. 14.  This deadline was later extended to April 27, 2022.  Dkt. No. 24.  It has been represented that Sario asserted his Fifth Amendment privilege with respect to the accounting.  Therefore, any objection to this requirement is moot.

Sario does not, however, argue that an order prohibiting him from destroying documents is inappropriate, and such a restraint is minimally intrusive.  It will stay in place.  Sario is ordered to comply with the provision against destroying documents as that order is reflected in the TRO.

As noted, at the hearing held in this matter on June 30, 2022, the Court extended the TRO until it rendered a decision on the motion for a preliminary injunction.  This decision will take effect on Wednesday, July 13, 2022 at 5:00 p.m. EDT, and the TRO will expire at that time.

SO ORDERED.

Dated: July 11, 2022
      New York, New York
                                     LEWIS J. LIMAN
                              United States District Judge